IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, DISTRICT 1199P,<br>        Plaintiff,<br>    v.<br><br>MONSOUR MEDICAL CENTER, INC., PHYSICIANS SERVICES, INC., WESTMORELAND PRIORITY, LLC and MICHAEL MONSOUR, in his individual capacity,<br>        Defendants. | 2:07-cv-1151 |

## MEMORANDUM ORDER

Pending before the Court are the following: (1) MOTION OF DEFENDANT WESTMORELAND PRIORITY, LLC ("Westmoreland") FOR SUMMARY JUDGMENT (Document No. 59); (2) MOTION OF DEFENDANT PHYSICIAN SERVICES, INC. ("PSI") FOR SUMMARY JUDGMENT (Document No. 63); and (3) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 67) filed by Service Employees International Union, District 1199P (the "Union"). The parties have each filed Concise Statements of Material Facts (Document Nos. 61, 65, 69), although no responses were filed. The motions have been thoroughly briefed (Document Nos. 60, 64, 68, 71, 72, 73) and are ripe for disposition.

Factual and Procedural Background

This is a case brought pursuant to the Employee Retirement Income Security Act ("ERISA") which arises from the failure of Monsour Medical Center, Inc. ("MMC") to make pension contribution payments on behalf of employees. The Amended Complaint asserts two counts: (1) joint and several liability of all Defendants for failure to make contributions to an

ERISA retirement pension plan; and (2) breach of fiduciary duty by MMC and Michael Monsour for directing that assets which could have been used to satisfy unpaid pension contributions be used for other purposes. The Court denied Defendants' motions to dismiss as to both counts. It appears to the Court that the summary judgment motions relate solely to Count One.[1]

In March 2006, after decades of financial troubles, the MMC hospital permanently closed. The hospital owed significant liabilities to its employees, including certain pension payments. The Union and MMC had entered into a series of collective bargaining agreements ("CBAs") over the years. Pursuant to the most recent CBA, MMC was obligated to make contributions to a "defined benefit" pension plan for each of its employees. To that end, the CBA required MMC to participate in a multi-employer fund (the "NIPF Plan") and to "make payments of ninety cents ($.90) per hour for all bargaining unit employees." In May 2004, MMC's participation in the NIPF Plan was terminated due to its failure to make past due contributions to the pension fund. The Union filed a grievance against MMC for breach of the CBA.

In late 2004, MMC filed for Chapter 11 voluntary bankruptcy. The Union filed a claim in the bankruptcy action for the unpaid pension contributions. In March 2005, MMC sought to withdraw from the Chapter 11 bankruptcy. The Union refused to consent to the withdrawal from bankruptcy unless the pension contribution issue was resolved. On March 22, 2005, John Bukovac, chief executive officer of MMC, and Claudia Davidson, attorney for the Union, signed

---

[1] The Union reports that Defendant Michael Monsour has been discharged of his liabilities by virtue of a Bankruptcy Court Order. The remaining Defendant, MMC, has not responded to the Amended Complaint and no counsel has entered an appearance on behalf of MMC. The Union has not sought a default judgment. *See* F.R.C.P. 55.

a two-page, handwritten agreement (the "March 22 Contract") on behalf of MMC and the Union.

In relevant part, the March 22 Contract stated:

> Subject to the approval of the Local Union Chapter membership and the Monsour Board of Directors, the Union + the Employer (Monsour) agree that those monies currently the subject of a pending grievance (as well as claims filed in the Bankruptcy Case [ ]) regarding the failure of the Employer to pay the employees $.90/hour from 5/1/04 to date [3-22-05], it is agreed that [MMC] will, as soon as it can, but no later than 6-30-05, or unless otherwise agreed to by the parties, to place those monies in their 403-B plan currently in place at Monsour, or some mutually agreeable alternative.  Additionally, it is agreed that [MMC] will as soon as it can, but no later than 6-30-05, or unless otherwise agreed to by the parties, increase the Bargaining unit employees' wages by $.90/hour per employee from 3-24-05 forward.

The parties dispute whether the Board of Directors of MMC ever approved this agreement.  The Union points to the minutes of the April 25, 2005 meeting of the MMC Board of Directors, which recognized the existence of the March 22 Contract and stated, in relevant part:

> SEIU Proposal
>
> Administration agreed to pay back the $.90 an hour owed to employees in lieu of the pension which has been terminated.  The Service Employees Internal [sic] Union agreed to the request of the Hospital to terminate the Chapter 11.

Defendants point to the minutes of the May 25, 2005 meeting of the MMC Board of Directors, which stated, in relevant part:

> SEIU Contract – Health Insurance
>
> . . .  A second union issue involves the $.90 an hour owed to employees once the pension was terminated.  Mr. Bukovac signed an agreement to begin paying the $.90 an hour effective June 1, 2005.  Following discussion, it was determined that the Hospital is unable to meet the $.90 an hour obligation at this time but recommends a proposal of $.30 an hour beginning September 7th.  The Hospital is also willing to extend the Union Contract.

The minutes of the June 22, 2005 MMC Board meeting state:

> The Service Employees International Union has agreed to a contract extension to

>September 7, 2005 and to extend the partial payment from the agreement regarding the pension money re-allocation.

It appears that from and after March 22, 2005, MMC never paid any amounts in contribution to a 403(b) plan or into "some mutually agreeable alternative" plan.  Indeed, it appears that MMC did not have a 403-B plan "currently in place" as stated in the March 22 Contract.  Previc Declaration.

In August 2005, Michael Monsour replaced Bukovac as chief executive officer of MMC.  On May 22, 2006, MMC and the Union entered into an "Effects of Closure" agreement which states, in relevant part (emphasis added):

>8.  Pension & Wage Supplement.  Prior to the closure, when the Hospital became delinquent in payments to the employee pension plan, and was therefore ejected from the pension plan, the union and the employer entered into a written agreement dated March 22nd, 2005, in order to ensure that employees would receive past due pension monies, and reimbursement for lack of pension monies going forward.  As of the date of this agreement, ***the Hospital acknowledges its obligation under the previous agreement that requires the employer to place lump sum dollar amounts into a 403(b) plan***, in accordance with the list calculated by the union and provided to the employer on April 27th, 2006, and in addition to increase each employee's hourly wage by ($0.90) cents per hour, retroactively to April 1st, 2005.  ***Since the March 22nd, 2005 agreement was reached, the employer has not placed any monies into 403(b) plans, and has only increased hourly wages by thirty ($0.30) cents per hour***.  Therefore the parties agree that this agreement shall remain open in respect to the 'Pension & Wage Supplement'; herein #8, and the parties further agree to continue to meet after the date of this agreement regarding the implementation of the March 22nd agreement.

The Union provided a list of amounts owed to each employee based on the total hours worked from May 2004 through the end of January 2005.  At no time did MMC, PSI or Westmoreland formally adopt a 403(b) plan or any other type of "mutually agreeable alternative" pursuant to the March 22 Contract or the Effects of Closure agreement, nor were any payments of $0.90/hour per employee ever made.

4

Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Id*. (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Legal Analysis

The novel question in this case is whether affiliated companies may be held liable for the failure of MMC to make agreed-upon contributions to retirement benefit programs for employees.  The Union argues that MMC agreed to fund a substitute for the employees' unpaid retirement benefits, that the March 22 Contract established an ERISA "defined benefit" pension plan, and therefore MMC had an obligation to make a one-time contribution of $202,574.20 for which Defendants PSI and Westmoreland, as affiliated companies, should be held jointly and

severally liable. Defendants argue: (1) that no pension plan was ever established; (2) if a plan was established, it was an "individual account" plan for which joint and several liability does not apply; and (3) even if such plan was a "defined benefit" plan, Westmoreland was not within the "controlled group" that may be held jointly and severally liable. The Union emphasizes the underlying policies of ERISA, the employees' expectations, and a statutory default in favor of "defined benefit" plans. The Union also notes that the CBA which had been in effect required MMC to participate in a defined benefit plan. The Union contends that the March 22 Contract was valid and enforceable, and that the employees expected a continuation of their defined benefits.

For the reasons set forth below, the Court concludes that no ERISA retirement "pension plan" was created by the March 22 Contract, albeit on grounds other than those asserted by Defendants.[2] Accordingly, the Court need not reach the remainder of the parties' contentions.

ERISA is a remedial statute, which should be liberally construed in favor of protecting participants in employee benefit plans. *IUE AFL-CIO Pension Fund v. Barker and Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir.1986). In *Rettig v. Pension Benefit Guarantee Corp.*, 744 F.2d 133, 155 (D.C. Cir. 1984), the Court explained that ERISA "was passed with the overwhelming purpose of protecting the legitimate expectations harbored by millions of employees of a measure of retirement security at the end of many years of dedicated service." Nevertheless, ERISA's scope is not unlimited. The Union's argument is predicated on the existence of an ERISA "defined benefit" pension "plan."

---

[2]Indeed, the Court rejects Defendants' contention that the MMC Board of Directors never approved the March 22 Contract. Subsequent board meeting minutes clearly belie that contention.

ERISA § 1002(3) defines the term "employee benefit plan" or "plan" to mean "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987) (the term "plan" is defined only tautologically in the ERISA statute). It is clear that the terms "plan" and "benefit" are treated separately and that there is a "basic difference" between those terms. *Id.*

In *Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206 (3d Cir. 1992), the Court of Appeals recognized that the "prevailing standard for determining whether a 'plan' within the meaning of ERISA has been established" was set forth in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982): "In summary, a 'plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler*, 973 F.2d at 209. "The crucial factor in determining whether a 'plan' has been established is whether [the employer has expressed an intention] to provide benefits on a regular and long-term basis." *Id. Deibler* cited *Fort Halifax* for the proposition that "no 'plan' [is] created where [the] employer assumes no responsibility to pay benefits on a regular basis, such that there is no need for financial coordination and control." *Id.*

The Court in *Donovan*, 688 F.2d at 1373, explained:

A decision to extend benefits is not the establishment of a plan or program. Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality-e.g., financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists-but it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative.

7

In *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530 (3d Cir. 1992), the Court held that a buyout plan to pay departing workers a lump sum of $75,000 and a year of continued benefits did not constitute an ERISA "plan" because it did not require the creation of a new administrative scheme. In concluding that the simple disbursement of money to each employee did not require an administrative scheme, the Court cited *Fort Halifax*, 482 U.S. at 12, for the proposition that "[t]o do little more than write a check hardly constitutes the operation of a benefit plan." The Court noted that any administration that was required for the year of continued benefits occurred pursuant to the benefits plan that already existed. 969 F.2d at 1538. *Accord Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256-57 (8th Cir. 1994) ("An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan. . . . The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits.").

The most analogous case is *Smith v. Hartford Ins. Group*, 6 F.3d 131 (3d Cir. 1993). In *Smith*, a hospital-employer made various oral representations and issued a one-page "Transition Provision" regarding a change in health care plans. The "Transition Provision" referred to the existing plan that was previously in place. The Court held that the hospital's oral and written representations did not constitute an ERISA plan: "Construed in the light most favorable to the Smiths, the Transition Provision was an 'act ... that record[ed] a 'decision to extend certain benefits.'" Citing *Donovan*, the Court reasoned that such acts may be *evidence* of a plan, but "they are not in themselves a plan." *Id.* at 136. The Court further noted that the plaintiffs' argument was undercut by the reference to another pre-existing plan. *Id.*

Applying these principles to the facts of this case, it is clear that no ERISA "plan" was

created by the March 22 Contract, even when viewed in the light most favorable to the Union. The March 22 Contract was simply that – a contract with rights and obligations of the parties, the Union and MMC.  MMC agreed to make a one-time payment of money in satisfaction of its past-due pension obligations.  All that was required was the simple, one-time writing of a check with no continuing administrative scheme.  To the extent that any administration was contemplated or necessary, the express terms of the March 22 Contract satisfied payment to the pre-existing "403-B plan currently in place at Monsour."  It matters not that no 403(b) plan actually existed – the important point for this analysis is that the March 22 Contract did not create a new administrative scheme.  It is also undisputed that no "mutually agreeable alternative" (which may have formed an ERISA plan) was ever established.  In sum, the March 22 Contract was an act that recorded an obligation of MMC to pay certain past-due benefits to employees through a tax-sheltered annuity (403(b) plan) but the "Contract"  itself did not constitute an ERISA "plan."  Accordingly, the Union's ERISA claims must fail and therefore PSI and Westmoreland are entitled to summary judgment.

The Court laments that, as a practical matter,  this result will likely preclude the employees from recovering retirement benefits to which they are rightfully entitled and which MMC is contractually obligated to provide.  Unfortunately, the Court is compelled to conclude that the Union's creative theory of ERISA liability is not supported by the facts of this matter or the applicable precedential authority.

In accordance with the foregoing, the MOTION OF DEFENDANT WESTMORELAND PRIORITY, LLC FOR SUMMARY JUDGMENT (Document No. 59) is **GRANTED**; the

MOTION OF DEFENDANT PHYSICIAN SERVICES, INC. FOR SUMMARY JUDGMENT (Document No. 63) is **GRANTED**; and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 67) filed by Service Employees International Union, District 1199P is **DENIED.**  Judgment will be entered in favor of Westmoreland and PSI.

Plaintiff has acknowledged that its claims against Defendant Michael Monsour have been discharged in bankruptcy.  The remaining named Defendant, Monsour Medical Center, Inc., has not been served[3] and has not participated in this litigation in any manner, nor has the Union otherwise pursued its claims against MMC.  Accordingly, the clerk shall docket this case closed.

SO ORDERED this 25th day of August, 2009.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:     Claudia Davidson, Esquire
        Email: cdavidson@choiceonemail.com

PHYSICIANS SERVICES, INC.
WESTMORELAND PRIORITY, LLC

        John R. Owen, III, Esquire
        Email: jowen@rwattorneys.com

MONSOUR MEDICAL CENTER, INC.

---

[3] According to Plaintiff, MMC claims that it no longer has any agents and thus cannot accept service.